UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ENES KANTER FREEDOM,<br><br>*Plaintiff*,<br><br>vs.<br><br>CHICAGO WOMEN'S BASKETBALL OPERATIONS, LLC,<br><br>METROPOLITAN PIER AND EXPOSITION AUTHORITY<br><br>And<br><br>CITY OF CHICAGO,<br><br>*Defendants* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. __________________<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

COMES NOW Plaintiff, Enes Kanter Freedom, and for Plaintiff's causes of action against Defendants, Chicago Women's Basketball Operations, LLC; Metropolitan Pier and Exposition Authority; and City of Chicago, states the following facts upon Plaintiff's personal knowledge as to Plaintiff and on information and belief as to all other matters:

**Background**

Plaintiff Enes Kanter Freedom believes deeply and advocates forcefully that the integrity of women-only sports must be protected, and he has been explicit in many public appearances on this point. Plaintiff Freedom has self-identified as a player who is eligible to play in the WNBA because such declaration is all that is required by WNBA's rules and the related Collective Bargaining Agreement between the league and the player's association. For this declaration of self-

identification, Plaintiff has been the target of a torrent of hateful attacks and discriminatory actions based on Plaintiff's viewpoint and gender identity. Most relevant for purposes of this complaint, the Defendants combined and conspired, and acted jointly to execute their conspiracy, to discriminate against Plaintiff based on Plaintiff's verbal and demonstrable expression of viewpoint and gender identity when they wrongfully ejected Plaintiff from a recent WNBA game. Defendants compounded and exacerbated Plaintiff's injuries when they subsequently banned Plaintiff indefinitely from attendance.

**Parties**

1. Plaintiff, Enes Kanter Freedom, is an adult, naturalized U.S. citizen.

2. Defendant Chicago Women's Basketball Operations, LLC, is a limited liability company organized under Illinois law. The LLC's principal office address is 2301 S. Lake Shore Drive, Chicago, IL 60616. The LLC owns and operates the Chicago Sky WNBA Team.

3. Defendant Metropolitan Pier and Exposition Authority ("MPEA") is a municipal corporation created by the Illinois General Assembly. The MPEA is created by the Metropolitan Pier and Exposition Authority Act, 70 ILCS 210/1 *et seq.*, as a political subdivision, unit of local government, body politic and municipal corporation. The board of the MPEA is appointed by the Governor of Illinois and the Mayor of Chicago. 70 ILCS 210/5.6.

4. Defendant City of Chicago is an Illinois municipal corporation and the largest city in the State of Illinois. The City of Chicago enforces its laws in the first instance through the City of Chicago's Police Department, which is not a separate entity but a department of the City of Chicago.

## **Jurisdiction and Venue**

5. This action arises under 42 U.S.C. § 1983 and the First Amendment. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4). Declaratory relief is authorized by 28 U.S.C. §§ 2201–02. Attorney fees are available under 42 U.S.C. § 1988

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1), as a substantial part of the events and omissions giving rise to the claims alleged herein occurred and are occurring in this district, and § 1391(b)(2) as all defendants are residents of Illinois. The events described below took place in Cook County, Illinois, which is inside the Eastern Division of this Court.

## **Legal Baseline**

7. When a municipal corporation owns and operates a sports arena that it opens to thousands of members of the public to gather, watch, and cheer sporting events, the arena constitutes a forum subject to the protections of the First Amendment to the United States Constitution, even if classified by law only as a "nonpublic forum" – a legal term of art. *See* Chicago Acorn v. Metropolitan Pier & Exposition Authority, 150 F.3d 695 (7th Cir. 1998), Air Line Pilots Ass'n v. Department of Aviation, 45 F.3d 1144 (7th Cir. 1995).

8. Governments may not restrict access to a non-public forum based on speech or expression of viewpoint unless such restriction on speech and expression is reasonable and not an effort to suppress expression merely because public officials disagree with the speaker's viewpoint. Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983), Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788 (1985).

9. State actors may not retaliate against anyone for the exercise of their First Amendment right to free speech and expression. Nieves v. Bartlett, 587 U.S. 391 (2019); Surita v. Hyde, 665 F.3d 860 (7th Cir. 2011).

10. Private parties act under color of state law when they conspire with government entities or actors to infringe on the First Amendment rights of anyone. Dennis v. Sparks, 449 U.S. 24 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).

**Facts Applicable to All Counts**

11. MPEA owns a parcel of land in the City of Chicago, Illinois, which includes the Wintrust Arena ("Wintrust Arena"). The Wintrust Arena was financed and built by the MPEA as a public project.

12. Beginning on or about July 2025, and continuing through all times relevant to this Complaint, MPEA not only owns Wintrust Arena but also manages it directly, without a separate management group or other intermediary, for its economic advantage.

13. MPEA provides security at Wintrust Arena. (Referred to in this Complaint as "Wintrust Arena Security.")

14. Chicago Women's Basketball Operations, LLC owns the Chicago Sky, a franchise in the Women's National Basketball Association.

15. The principal owner of the Chicago Sky WNBA Team is Michael Alter.

16. The Chicago Sky WNBA Team plays its home games at MPEA's Wintrust Arena. The Chicago Sky occupies Wintrust Arena under a license from the MPEA.

17. The City of Chicago has a policy and practice of delegating to Chicago Police Officers all decision-making for enforcement of determinations made by the Wintrust Arena

Security and Staff as to which speech is and is not allowed at Wintrust Arena. Thus, Chicago Police Officers hold the ultimate authority to enforce decisions by Wintrust Arena Security and Staff to eject individuals from Wintrust Arena on behalf of the City of Chicago and Chicago Sky NBA Team.

18. MPEA has a policy and practice of delegating to the individual officers of Wintrust Arena Security the discretion to determine which speech is and is not allowed at Wintrust Arena. Thus, officers of Wintrust Arena Security hold the ultimate legal authority to eject individuals from Wintrust Arena on behalf of the MPEA, including ejecting individuals spectating Chicago Sky WNBA Team games.

**Background Facts Leading to the Deprivation Plaintiff's Rights**

19. Plaintiff Freedom has for many years been a zealous human rights supporter who advocated for expanded freedom for the Turkish people, has exposed religious oppression of Muslim Uyghurs in China, the use of slave labor in the production of athletic shoes in China, and has enthusiastically advocated for the integrity and protection of women's sports.

20. Plaintiff was a professional basketball player in the NBA. Plaintiff Freedom stands six feet, ten inches tall, and has a wingspan of 85 inches.

21. The issue of defining the word "woman" is relevant to this action because the WBNA's failure and ensuing refusal to define the term has dominated headlines and generated significant news reporting for several weeks preceding the relevant events to this action

22. In 2026, Plaintiff announced that Plaintiff identifies as eligible to play in the WNBA and announced Plaintiff's entry into the 2027 WNBA Draft. This announcement sparked backlash against Plaintiff within and surrounding the WNBA and its fanbase. The WNBA has failed and still refuses to define what a woman is in the context of the WNBA's own rules.

23. In July 2026, during an interview with ESPN, WNBA player Sophie Cunningham, who plays for the Indiana Fever, stated her support for protecting women's sports, saying, "…I want to protect young girls in a locker room, or young girls in sport who shouldn't have to go against biological men."

24. Plaintiff followed Ms. Cunningham's comments with statements and actions in support of her expressed viewpoint regarding women's sports and thereby ignited debate among WNBA players, owners, front-office personnel, commentators, and fans.

25. In July of 2026, individuals expressing support of women only sports began peacefully gathering at WNBA games across the country where the Indiana Fever were playing in order to show their support for Ms. Cunningham and her stated position on the integrity of women-only sports. In some instances, other individuals gathered at WNBA games to express views in opposition to Ms. Cunningham. A robust public debate was underway in a very high-profile manner.

26. While the majority of the public and an unknown portion of the WNBA's fan base supports protecting women-only sports by excluding males, supporters of trans-identifying males competing in women-only sports competitions have been allowed to demonstrate inside WNBA arenas and have harassed, abused, and intimidated WNBA spectators who support the integrity of women's sports. In one highly publicized instance, Seattle Storm co-owner Celeste Keaton reportedly yelled at two 16-year-old female fans of Sophie Cunningham, screaming at them that they are "f*cking insane." The teenage girls in question were wearing T-shirts that expressed their support for the integrity of women's sports.

**August 23, 2026**

27. On August 23, 2026, Plaintiff Freedom attended the WNBA game between the Indiana Fever and the Chicago Sky at Wintrust Arena in Chicago, Illinois.

28. More than three hours before the game, Plaintiff's manager, Hank Fetic, sent a courteous text message to the Chicago Sky's general manager, formerly the personal trainer of Plaintiff Freedom, Jeff Pagliocca, informing him that Plaintiff Freedom would be in attendance at the game.

29. Approximately thirty minutes before the opening tip-off, Mr. Pagliocca acknowledged Mr. Fetic's message and said, "Appreciate the text."

30. Upon learning that Plaintiff would be in attendance at the game, the Chicago Sky's owner, Mr. Alter alerted Wintrust Arena Security. The warning claimed that Plaintiff Freedom's ticket had not been purchased in Plaintiff's own name and falsely attributed to Plaintiff Freedom bad intentions attending the game. There is no evidence that Mr. Alter treated other similarly situated spectators in the same way. Indeed, there is no evidence that Mr. Alter similarly alerted Wintrust Arena Security with respect to the other untold number of spectators who attended the game and who had also not purchased tickets in their own names.

31. As Plaintiff Freedom peacefully walked into Wintrust Arena, Plaintiff Freedom was harassed by Chicago Sky fans, who said to Plaintiff Freedom:

"Get your bitch ass out of Chicago!";

"fuck you, bitch"; and

"bitch ass n-----!"

Among other things.

32. None of these fans were warned or ejected, despite profanity and racial slurs being express violations of the WNBA Fan Code of Conduct.

33. The Chicago Sky's security, the MPEA's Wintrust Arena Security, and the City of Chicago Police Department were jointly providing security for the game.

34. Inside Wintrust Arena, Plaintiff Freedom was sitting courtside and wearing a shirt that said, "WOMAN noun, adult human female." The shirt bore no obscene or indecent content, which is the only clothing restriction in the WNBA Fan Code of Conduct.

35. In the third quarter of the game, Plaintiff Freedom stood and raised Plaintiff's arms in celebration of a three-point shot made by Ms. Cunningham.

36. A few possessions later, Chicago Sky player Natasha Cloud made a shot and then, without provocation, initiated a vulgar, profanity-laced verbal tirade directed at Plaintiff Freedom personally, and charged nearly half the length of the court toward where Plaintiff Freedom was sitting courtside. Cloud cursed and yelled at Plaintiff saying that Ms. Cunningham was not going to sleep with Plaintiff Freedom.

37. Plaintiff Freedom believes that Cloud's attack was motivated and triggered by the message on Plaintiff's shirt and Plaintiff's widely publicized viewpoint on protecting the integrity of women only sports.

38. Plaintiff Freedom stood courtside facing Cloud and raised Plaintiff's arms in confusion and disbelief as Cloud charged toward Plaintiff while continuing to scream profanities, in violation of WNBA rules. Sky Player Cloud was not ejected, suspended, or otherwise disciplined for violating WNBA rules, and Chicago Sky Owner Mr. Alter has confirmed that the Chicago Sky organization has no plans to institute any kind of disciplinary measures against Sky Player Cloud.

39. At various points in the game, other fans stood up and were physically closer to the baseline than Plaintiff was—and directed verbal statements at players.

40. Plaintiff calmly responded to Sky Player Cloud's verbal attack, saying "I'm not trying to sleep with her. I'm just here to protect women and support her."

41. Chicago Sky Owner Mr. Alter subsequently mischaracterized the interaction, saying that Plaintiff Freedom was "chirping" at Ms. Cloud, and repeatedly mischaracterized Plaintiff Freedom's intentions to protect women only sports, calling them lies. Mr. Alter went further in questioning Plaintiff's intentions when he said, "It was pretty clear to us that his purpose of coming here was trying to be provocative and just see how much attention he could get and stir up and create." Plaintiff denies making any statement or provocation to Cloud before her approach.

42. The Chicago Sky's security, Wintrust Arena security, and the City of Chicago's Police Department combined and conspired to eject Plaintiff Freedom from the game.

43. According to Chicago Sky Owner Mr. Alter, "The guy from the Arena, Monterey, was right there. It took a second for Chicago's guys to go to get there, but they got there pretty damn fast." Mr. Alter further confirmed that the Plaintiff's ejection was executed by the City of Chicago Police Department when Alter responded to a question about whether the City of Chicago Police Department had formulated a report about the incident. In response, Mr. Alter said, "I know the [City of Chicago Police Department] determined him a threat because they told him to leave."

44. According to Chicago Sky Owner Mr. Alter, "We had Arena security, we had . . . Chicago Sky security, Chicago Police Department, all of them were there. All of them acted immediately. All of them, you know, it was the quickest decision I've ever seen in someone being ejected from a game."

45. Security ordered Plaintiff Freedom to leave Wintrust Arena and physically escorted Plaintiff to the foyer of Wintrust Arena.

46. Plaintiff Freedom complied with the orders by Chicago Police Officers and Wintrust Arena Security, but Plaintiff Freedom asked the Officers and Staff to verbally advise Plaintiff Freedom of the reason justifying ejection.

47. Chicago Police Officers and Wintrust Arena Security did not give a specific reason, saying only that Plaintiff Freedom had to leave MPEA's Wintrust Arena.

48. The City of Chicago's Police Department escorted Plaintiff from the foyer to the exterior of Wintrust Arena.

49. Subsequently, Chicago Sky Owner Mr. Alter falsely characterized the events leading to Plaintiff Freedom being summarily ejected by claiming, "certain threats don't get warnings," and likened Plaintiff Freedom's action in reacting to Sky Player Cloud's verbal attack to "shooting a gun."

50. In an interview with OutKick, Chicago Sky Owner Mr. Alter said the following, "I mean, to use an extreme example, when you shoot a gun at someone, you don't get a warning, 'Don't do that again.' Your action doesn't deserve a warning. You take action that becomes a threat, you don't get a warning."[1]

51. In the same interview, Alter confirmed that Sky Player Cloud would face no disciplinary action for her aggressive and provocative action towards Plaintiff Freedom.

52. Plaintiff Freedoms actions, no matter how minimal or innocuous, are construed as threatening due to his disapproved viewpoint. Sky Player Cloud's actions, on the other hand, are construed as innocent due to her approved viewpoint.

---

[1] Chicago Sky Owner Michael Alter Full Interview on Enes Kanter Freedom Ejection, Fox News (Aug. 27, 2026), (Available at: https://www.foxnews.com/video/6404101303112)

53. After the game, Cloud posted the following on social media site Threads: "To every trans kid/person, You are a part of MY community and tribe. You belong. You are loved. You're seen. You're perfect as you are. & you will always be protected by me."[2]

54. In truth and fact, Plaintiff Freedom made no threat- neither in the sense of common usage of that term, nor under the constitutional category of "true threat." Counterman v. Colorado, 600 U.S. 66 (2023), Virginia v. Black, 538 U.S. 343 (2003).

55. The accusation of a "threat" is a *post hoc* justification offered to obscure the fact that Defendants removed Plaintiff from public property because they disagree with Plaintiff Freedom's expression of a viewpoint supporting women-only sports.

56. A fan who was sitting near Plaintiff Freedom and followed Wintrust Arena Security and Chicago Police Department officers as they removed Plaintiff Freedom from the Arena attested that Plaintiff had not behaved in any threatening manner. "I was sitting right next to him, he didn't say a word," she remarked to the officers.

57. Chicago Sky Owner Mr. Alter later announced to the public through the media that Plaintiff Freedom was permanently banned and will not be allowed to enter Wintrust Arena in the future.

58. Chicago Sky Owner Mr. Alter stated, "[Plaintiff Freedom] has demonstrated to us unequivocally that he has the potential to be a threat," Alter said. "That he is not able to control himself to the extent where we can be comfortable that he may [not] step towards the court again

[2] Natasha Cloud (@t__cloud9), Threads (August 23, 2026), (Available at: https://www.threads.com/@t__cloud9/post/DcaByfOEQ3I?xmt=AQG0bCl6pdAjtzGGc75UjmNSnlBh_h0BrIyDso3k06m0fg)

and towards the players. "So that is the basis for which we will not permit him into the building until such time as he can prove otherwise."[3]

59. Chicago Sky Owner Mr. Alter has stated that Plaintiff will not be provided with details or parameters regarding how the indefinite ban might end, instead offering an amorphous directive, saying "that's for him to decide. I'm not going to give him a roadmap…. He has to prove to us that he understands that what he did was completely beyond the pale and not allowed and is never going to happen again. So how he does that is up to him to figure out."

60. The Chicago Sky; MPEA, through Wintrust Arena Security; and the City of Chicago, by its Police Department, worked together to eject Plaintiff in retaliation for protected expression, and continue to work together to enforce the ongoing, unconstitutional ban of Plaintiff from Wintrust Arena, which is public property owned by MPEA.

**Count I**
**Action under § 1983 of Title 42 of the U.S. Code**
**Retaliation in Violation of the First Amendment**

61. Plaintiff incorporates the averments made above as if they were fully set forth herein.

62. Plaintiff engaged in peaceful expression protected by the First Amendment when Plaintiff spoke out defining "woman" in the context of the integrity of women's sports and when Plaintiff wore to the Chicago Sky game on August 23, 2026, a shirt that defined "woman" as an "adult, human female."

63. Defendants, under color of state law, through authorized delegees, took adverse action against Plaintiff and placed concrete consequences upon Plaintiff when they worked together to eject Plaintiff from Wintrust Arena, in direct violation of Plaintiff's protected

---

[3] Kareem Copeland, *Sky ban Kanter Freedom from arena after clash with Cloud,* ESPN, (Aug. 25, 2026) (Available at: https://www.espn.com/wnba/story/_/id/49725856/sky-ban-kanter-freedom-arena-clash-cloud)

constitutional rights.

64. Defendants have ratified the decisions of their authorized delegees by taking no remedial action on the ejection and by agreeing to enforce the ongoing, unconstitutional ban of Plaintiff from Wintrust Arena.

65. Plaintiff's damages continue as long as the unconstitutional ban of Plaintiff from Wintrust Arena remains in place.

66. The adverse actions that Defendants have taken and continue to take against Plaintiff would chill a person of ordinary firmness from continuing in the protected expression.

67. Defendants' adverse actions are motivated by Plaintiff's exercise of protected expressive activity. But for Plaintiff's protected expressive activity, Plaintiff would not have been ejected or banned.

68. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages and will be immediately and irreparably harmed until the unconstitutional ban is lifted.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor on Count I and award the following relief:

A. A judgment declaring that the Defendants violated Plaintiff's First Amendment rights by ejecting Plaintiff from Wintrust Arena and indefinitely barring Plaintiff from re-entry; and

B. A permanent injunction following a full hearing, directing Defendants to lift their prohibition on Plaintiff's attendance at Wintrust Arena;

C. An award of nominal and compensatory damages for Plaintiff's losses incurred;

D. An award of reasonable attorney fees and costs to Plaintiff; and

E. Any additional relief that the Court deems appropriate.

**Count II**
**Action under § 1983 of Title 42 of the U.S. Code**
**Violation of the First Amendment**

69. Plaintiff incorporates the averments made above as if they were fully set forth herein.

70. Defendants acted under color of state law when they ejected Plaintiff from Wintrust Arena because of Plaintiff's viewpoint on protecting the integrity of women's sports as expressed in ways that were not threatening or in any way proscribable.

71. Defendants' banning of Plaintiff from Wintrust Arena is neither reasonable nor viewpoint-neutral.

72. Plaintiff poses absolutely no danger or immediate threat to public safety.

73. The conduct to which Defendants have subjected, and continue to subject, Plaintiff has deprived, and continues to deprive, Plaintiff of the right to freedom of speech under the First Amendment to the United States Constitution.

74. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages and will be immediately and irreparably harmed until the unconstitutional ban is lifted.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor on Count II and award the following relief:

A. A judgment declaring that the Defendants violated Plaintiff's First Amendment rights by ejecting Plaintiff from Wintrust Arena and indefinitely barring Plaintiff from re-entry; and

B. A permanent injunction following a full hearing, directing Defendants to lift their prohibition on Plaintiff's attendance at Wintrust Arena;

C. An award of nominal and compensatory damages for Plaintiff's losses incurred;

D. An award of reasonable attorney fees and costs to Plaintiff; and

E. Any additional relief that the Court deems appropriate.

RESPECTFULLY SUBMITTED

*/s/ Daniel J. Rhoads*
Daniel J. Rhoads
Illinois State Bar No.6297505
*Of Counsel*
America First Policy Institute
1455 Pennsylvania Avenue NW
Washington, D.C. 20004
LegalAction@americafirstpolicy.com
(317) 989-4833
*Attorney for Plaintiff*
*Enes Kanter Freedom*

Leigh Ann O'Neill
*Pro hac forthcoming*
America First Policy Institute
1455 Pennsylvania Avenue NW
Washington, D.C. 20004

Gina D'Andrea
*Pro hac forthcoming*
America First Policy Institute
1455 Pennsylvania Avenue NW
Washington, D.C. 20004

Andrew Zimmitti
*Pro hac forthcoming*
America First Policy Institute
1455 Pennsylvania Avenue NW
Washington, D.C. 20004